LAW OFFICE OF CARL M. VARADY
Carl M. Varady
Pauahi Tower
1003 Bishop Street, Suite 1730
Honolulu, Hawai'i 96813
Telephone: 808-523-8447
Facsimile: 808-523-8448
e-mail: carl@varadylaw.com

Attorney for Plaintiff
DALE VAUGHT

## UNITED STATES DISTRICT COURT
## DISTRICT OF HAWAI'I

| | | |
|---|---|---|
| DALE VAUGHT, | ) | Case No. |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **COMPLAINT FOR** |
| | ) | **DECLARATORY RELIEF FOR** |
| AETNA LIFE INSURANCE | ) | **LTD BENEFITS; EXHIBIT 1;** |
| COMPANY, | ) | **SUMMONS** |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

Plaintiff Dale Vaught ("Plaintiff" or "Vaught") alleges as follows:

## JURISDICTION

1.     Plaintiff's claim for relief arises under the Employee Retirement

Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1132(a)(1).

Pursuant to 29 U.S.C. § 1331, this court has jurisdiction over this action because

this action arises under the laws of the United States of America.  29 U.S.C. §

1132(e)(1) provides for federal district court jurisdiction of this action.

## VENUE

2.      Venue is proper in the District of Hawai'i in that Plaintiff is a resident

of the City and County of Maui, and in the State of Hawai'i.  Therefore, 29 U.S.C.

§ 1132(e)(2) provides for venue in this court.

## PARTIES

3.      Plaintiff  is, and at all times relevant hereto was, a participant, as that

term is defined by 29 U.S.C. § 1002(7), of the Marriott International, Inc., Long

Term Disability Plan ("The Plan") and thereby entitled to receive long term

disability ("LTD") benefits therefrom.  Plaintiff was a participant because he was

an employee of Marriott International, Inc., for whose employees' benefit The

Plan was established.

4.      Defendant Aetna Life Insurance Company ("Aetna") issued long term

disability Group Policy No.: GP-698443 ("The Policy") to Marriott International,

Inc.  Aetna thereby insured The Plan and is obligated to provide all benefits

claimed, and acted on behalf of The Plan in all matters alleged herein, including

making the decisions to terminate Plaintiff's LTD benefits and to deny his

administrative appeal of that decision.

## CLAIM FOR RELIEF

5.     Plaintiff was employed by Marriott International, Inc. as a sales executive.

6.     Vaught has been diagnosed with and is disabled by New Persistent Head Pain Disorder, also known as New Daily Persistent Headache ("NDPH"). NDPH is unique in that the headache is daily from onset, typically in a person with no history of headaches, can continue for years without any sign of alleviation despite aggressive treatment,  and in many cases, including Vaught's, continues as daily and unremitting pain.

7.     The diagnostic criteria for NDPH is daily pain present for more than two months with untreated headache duration greater than four hours a day. Headache location is typically bilateral, and pain can occur anywhere in the head. It is usually dull, aching, constant and pressing in quality with associated symptoms such as nausea, noise sensitivity or lightheadedness.  Routine physical activity, such as walking upstairs, may aggravate the pain.

8.     When NDPH is refractory and resistant to treatment, as is Vaught's, it can continue for years and even decades after onset and be completely disabling to the individual.  It does not respond to preventive or abortive medications.

9.     Vaught became disabled with NDPH in September 2009.

## THE INITIAL CLAIM

10.     The Policy provides long term disability benefits after an elimination period of 182 days, after which a person under the age of 62 at the time the disability occurred, as was Plaintiff herein, could potentially continue to accrue such benefits until age 65.

11.     The following pertinent definitions and provisions are provided in the Policy:

A.     The Policy defines totally disabled as:

"From the date that you first  became disabled until monthly benefits are payable for 24 months you meet the test of disability on any day that:

*     You cannot perform the material duties of your own occupation solely because of illness, injury or disability pregnancy related condition; and

*     Your earnings are 80% or less of your adjusted predisability earnings."

"After the first 24 months of your disability that monthly benefits are payable, you meet the plan's test of disability on any day you are unable to work at any reasonable occupation solely because of illness, injury or disabling pregnancy-related condition."

B.     Own Occupation is defined as:

"The occupation that you are routinely performing when your period of disability begins.  Your occupation will be viewed as it is normally performed in the national economy

instead of how it is performed:

* For your specific employer; or,

* At your location or work site; and,

* Without regard to your specific reporting relationship."

12.  Plaintiff applied for LTD benefits from Aetna in January 2010.

13.  After receiving Vaught's claim for benefits, Aetna comprehensively investigated his claim, including:

A. Obtaining extensive medical records from his treating doctors.

B. Causing a private investigator to conduct surreptitious surveillance of Plaintiff on March 11, 12 and 13, 2010.  The only activity observed was that Vaught went to a doctor's office on one occasion.

C. On April 20, 2010, Aetna required Vaught to attend an independent medical examination ("IME") by a forensic psychiatrist, Keith Ablow, M.D.  Dr. Ablow concluded "There is no data with which to refute Mr. Vaught's claim that his concentration and performance are impaired to an extent that he is rendered disabled at this time, and permanently so, for all intents and purposes."

14.     Vaught was granted LTD benefits on or about May 22, 2010, and

benefits were paid effective March 11, 2010, the date The Policy's elimination

period was satisfied.  Aetna determined that due to his disability, Vaught was

unable to perform the material duties of his own occupation.

15.     After awarding Vaught LTD benefits Aetna continued to investigate:

A.     On September 17, 2010, Aetna required Vaught to attend an

IME by a Board Certified neurologist, Cora Tasaki, M.D.  Dr.

Tasaki issued a report in which she concluded, "It appears that

the patient would have difficulty performing a full eight hours

of work duty in his prior occupation."  She provided no

specific treatment recommendations to Vaught, but did

recommend that Aetna "have more current neuropsychological

testing performed . . ."

B.     Aetna again caused Vaught to be surreptitiously surveilled for

three days in September and October 2010.  No activity was

noted.

16.     Aetna did not act on Dr. Tasaki's recommendation that it get more

current neuropsychological testing performed.  Instead, it requested a paper review

of Vaught's records from one of its contracted doctors, Stuart Rubin, Board

Certified in physical medicine and rehabilitation.  Dr. Rubin produced a report on

Aetna letterhead dated March 12, 2012, in which he summarized Vaught's

recurrent complaints of chronic pain and extensive efforts to obtain treatment for

that chronic pain but then concluded "functional impairments are not supported."

## THE INITIAL TERMINATION

17.     By letter dated April 9, 2012, Aetna terminated Vaught's LTD

benefits effective April 1, 2012 ("The Initial Termination").  The termination letter

stated that Aetna had determined that Vaught had the full time light work capacity.

The letter also informed Vaught that he was entitled to an appeal of the adverse

benefit determination; it specifically suggested that Vaught submit "any

neuropsychological evaluations performed but not previously produced" in order

to perfect his claim.

18.     In response to The Initial Termination letter, on August 20 and 28,

2012, Vaught underwent a neuropsychological examination administered by Mark

E. Todd, Ph.D.  Dr. Todd reported, in pertinent part:

> A.     "As a result of his chronic pain, he has had cognitive
>
>         impairments. He has diminished attention and concentration
>
>         and problems with focus. He cannot multitask. This problem
>
>         has been characterized as a 'disconnect syndrome.'"
>
> B.     "He will not recall what he reads. He tends to forget recent
>
>         more than remote events. He may misplace personal objects

and forget names of people he should know. He was not able to
do his work because of his cognitive changes."

C.    "He complains of word finding and word expressive
difficulties. He notes problems with language comprehension .
. . He can be confused and overwhelmed."

D.    ". . .On the validity scales, there was no evidence of fixed or
inconsistent responding. He did not appear to over endorse or
under report symptoms. As a result a valid profile was believed
to have been obtained."

E.    "Neuropsychological testing together with educational,
employment, and life history indicates an individual of overall
premorbid mental abilities in the clearly average or above
average range. His overall intellectual functioning is only
borderline, which is clearly less that would be expected. While
his verbal comprehension index, reading and arithmetic are all
within the average range, his perceptual reasoning, working
memory, and processing speed indices are only borderline."

F.    "Testing clearly shows cognitive inefficiency with
psychomotor and cognitive slowing. Tests of executive

functioning reveal only borderline to low average scores, which are clearly less than expected . . ."

G.     "Overall, the patient's neuropsychological profile appears to provide evidence of a fairly pronounced cognitive disorder. He has clearly less than expected cognitive efficiency, language difficulties, visual perceptual problems, as well as less than expected learning and memory. These scores are actually at a level that would meet criteria for dementia."

H.     "Irrespective of the cause of his impairment, what is clear is that he is experiencing measurable deficits. These problems are likely to keep him from being able to work in the capacity that he had described. He is clearly cognitive inefficient, has less than expected learning and memory, poor attentional skills, poor task persistence and difficulties with executive functioning. These deficits would prohibit him from being able to work successfully in a competitive work environment."

19.    Vaught submitted his appeal from The Initial Termination of his LTD benefits to Aetna by letter dated September 14, 2012. The appeal consisted of his lawyer's 73-page appeal letter, Vaught's sworn declaration, additional medical evidence, Dr. Todd's report, and medical and vocational literature.  The letter

explained, in pertinent part: Vaught's condition; that his condition had not improved since he became disabled; summarized the IME reports of Drs. Ablow and Tasaki; that Dr. Rubin's report was severely flawed and was based on very limited information; summarized Dr. Todd's findings; discussed the systemic errors of Aetna's vocational assessment; and otherwise demonstrated the errors of Aetna's decision and demonstrated that Vaught continued to be entitled to benefits under The Policy.

20.    In response to Vaught's appeal of The Initial Termination, Aetna obtained:

      A.    A "physician review" by Dr. Vaughn Cohan, Board certified in neurology, dated November 5, 2012.  Dr. Cohan's review is on Aetna letterhead and thus it appears that Dr. Cohan is directly contracted with Aetna to provide such reviews.  Dr. Cohan concluded that Vaught is not disabled from any employment.  The basis for Dr. Cohan's report, in essence, is Dr. Cohan's medically unsupported, unsupportable, and untrue assertion that Vaught presents with "subjective complaints out of proportion to the objective findings. . . ."  Since the nature, extent, and magnitude of pain is inherently subjective and not objectively measurable, and since medical science has no

objective basis to evaluate the nature, extent, or magnitude of pain, Dr. Cohan's conclusion is without any factual basis and, fundamentally, since pain cannot be objectively measured, it therefore cannot be disabling.  That implied conclusion is contrary to well established medical science.

B.   A physician review, on Aetna letterhead, from Dr. Elana Mendelsshon, Psy.D., Board certified clinical psychology and neuropsychology.  Dr. Mendelsson has worked for Aetna for many, many years and derives substantial income from her services to Aetna.  She asserted that Dr. Todd's neuropsychological evaluation "does not likely provide an accurate measurement of the claimant's neuropsychological functioning . . ." and that "the provided information did not include sufficient evidence to clearly support the presence of a functional impairment from 4/1/12 through 11/30/12."  She also concluded that no restrictions or limitations would be considered appropriate based on her review of the information.  By virtue of her regular employment by Aetna and the substantial economic benefits she derives therefrom, Dr. Mendelsshon is not an independent doctor, is biased, and her

11

opinion is not credible.

C.   A "physician review" through MES Solutions by Dr. Jamie Lee

Lewis dated November 14, 2012.  Dr. Lewis is board certified

in physical medicine and rehabilitation with a sub-speciality in

pain medicine.  He concluded:  that Vaught can work a total of

eight hours per day and 40 hours per week; that clinical

findings are not identified that would result in any significant

impairment from a physical medicine and pain medicine

perspective; that based on the provided documentation there

are no restrictions on the physical demand level of work that

Vaught can perform from April 1, 2012, through November 30,

2012.  By virtue of the economic benefit he derives from

providing services to MES Solutions and by virtue of MES

Solutions receiving significant economic benefits from

providing reviewing doctors to Aetna, Dr. Lewis' opinion is

not credible.  Additionally, as a matter of custom and practice,

Dr. Lewis does, and has, altered his medical reports on the

demand of hiring insurance companies or plan administrators,

further demonstrating that his opinions are not to be credited.

D.   Dr. Cohan provided a supplemental report dated December 7,

2012.  Dr. Mendelsshon provided a supplemental report dated

December 7, 2012.  Dr. Lewis provided a supplemental report

dated December 16, 2012.  None of the doctors changed their

opinions.

21.     By letter dated December 24, 2012, Aetna denied Vaught's appeal

from the termination of his LTD benefits and informed Vaught that its decision

was not subject to further review.  The letter primarily relied upon the opinions of

Drs. Cohan, Mendelsshon, and Lewis, summarized above.

## THE INITIAL SUIT

22.     On March 18, 2013, Vaught, through counsel, filed suit against

Aetna, ("The First Suit") in the District of Hawai'i, Civil  Case No.: 13-00130

SOM .

23.     During the course of litigation of The First Suit, on August 12, 2013,

opposing counsel, Ronald Alberts, informed Vaught's counsel that Aetna had

decided to "put Mr. Vaught back on benefit."  Alberts asked for payment

information and counsel's demand for attorneys fees.

24.     The initial SSA decision on August 27, 2013, was heard by

Administrative Law Judge ("ALJ") Antonio Acevedo Torres, who found, in part:

> "The severity of the claimant's impairments meet the
> criteria of section 12.02. . . . because the claimant has
> memory impairment and loss of measured intellectual

> ability. . . . [and] because the claimant's impairments
> cause moderate restriction in activities of daily living,
> marked difficulties in maintaining social functioning,
> marked difficulties in maintaining concentration,
> persistence or pace, and no episodes of decompensation,
> each of extended duration."

25.     On September 10, 2013, Alberts notified Vaught's counsel that Aetna would pay the fees and costs demanded, which totaled $33,083.13.

26.     In Aetna's claim notes dated September 13, 2013, Tammy Maurice noted "received email to reinstate ltd claim due to mediation effective 04/01/2012."

27.     By letter dated September 13, 2013, Aetna notified Vaught, through counsel, that its termination of Vaught's benefits was being overturned and payment was being forwarded.  It also stated that Vaught's claim was being forwarded to its vocational department for review for return to work assistance.

28.     On September 26, 2013, Aetna paid all requested attorneys fees and costs totaling $33,083.13.

29.     By letter dated October 29, 2013, Aetna acknowledged that Vaught could not perform the material duties of his own occupation and that it was initiating the any occupation review.

## FURTHER CLAIM ADMINISTRATION

30.     On December 2, 2013, after receiving notice of Vaught's award of

Social Security Disability benefits, Aetna demanded and received repayment of an overpayment of $61,799, caused by the retroactive SSDI award and reduced Vaught's LTD benefit by $2,131, per month.

31.   Pursuant to ALJ Torres' order, the SSA performed a review of Vaught's SSDI benefits beginning in February 2015. By letter dated July 22, 2015, the SSA re-certified Vaught's receipt of SSDI benefits. The SSA performed a review of Vaught's continued entitlement to SSDI benefits report by the SSA's Nadine J. Genece, Phy. D., who concluded, in part:

> "8//2013 CPD was an ALJ decision – meets 12.02. MER shows severe ongoing chronic daily Has resulting in severe cognitive limitations. FSIQ 75. Impaired language skills. Phsychomotor/cognitive slowing evidence. Decreased concentration 2nd to pain. MSEs showed depression and anxiety sx."

> "CDR MER shows ongoing chronic medically intractable headaches. He has undergone multiple tx modalities w/minimal pain relief. MMSE shows stable cognitive impairment 2nd to chronic pain. TS provides an ORC indicating the clmt is unable to work in any capacity now or in the future due to constant pain and cognitive declined. Suggest no SMI has occurred. HSBAUE/DEA III."

> "7/22/15 YMC: Clmt was allowed by the ALJ 2013 with a meets listing 12.02. Clmt's conditions are severe, well documented in the current MER and consistent with ALJ findings at CPD. He has severe cog dysfunction related to refractory pain. He continues to struggle with attention /concentration, is blocking on names of

individuals he should remember, has troubles recalling
details of recent event. Day to day fx has been modified
to such degree that his finances are being directly
deposited, monthly bills are automatically withdrawn.
He relies on loyal friends for support. Recent
performance on short mental status exam slightly
improved from performance the year prior by TMD by
clmt remains w sig cog dysfunction sufficient to interfere
w day to day. ADLS are impaired and consistent with
evidence. There is no SMI related to work. Recommend
continuance. Nadine J. Genece, Psy.D."

32.     Aetna, through Access Medical Evaluations, hired Dr. Phillip Barry

to conduct the neuropsychological evaluation of Vaught, which was performed on

July 23-24, 2014.

33.     Dr. Barry reported that he administered six different tests plus an

MMSE and validity tests. Dr. Barry provided a score of 24/30 for the MMSE,

which he opined was "abnormally low for his [Vaught's] age and suggests

significant cognitive impairment." Dr. Barry noted, "while these results are

abnormal, they are not credible due to Mr. Vaught's failure to obtain acceptable

scores on symptom validity tests as reported below. No additional cognitive test

results will be reported herein for this reason. There can be no confidence that the

results are accurate reflections of his true level of cognitive function."

34.     The date of Dr. Barry's report is the date of the evaluation.

There is a fax header at the top of the report of August 24, 2014, with Dr. Barry's

fax number included.  Then there is nothing noted by Aetna until September 21,

2014.  The next notation regarding the IME in the claim file is not until October

29, 2014.  So there is a lapse of one month between the time the tests were taken

and the apparent completion of the report.  Then there was another month before

Aetna logged the report as having been received and another month before Aetna

took any action on the report.

35.     By report dated October 31, 2014, Aetna's Dr. John P. Shallcross

reviewed Vaught's file and Dr. Barry's report.  Dr. Shallcross repeated Dr. Barry's

assertion that no validity testing was performed by Dr. Mark Todd in the August

2012 neuropsychological evaluation performed on Vaught.

36.     By letter dated January 9, 2015, Aetna informed Vaught, through

counsel, that it would not release the raw data of Dr. Barry's testing to Vaught's

Dr. Woodruff because Dr. Woodruff was not a neuropsychologist.  Vaught,

through counsel, then hired a neuropscyhologist, Dr. Roger Light, to review Dr.

Barry's report and requested to receive and review the raw data.

37.     By letter dated February 5, 2015, Vaught, through counsel, submitted

a request along with Vaught's authorization to Dr. Barry, copying Aetna,

requesting that Dr. Barry provide Dr. Light with the raw data of Dr. Barry's

testing.

38.     By letter dated February 16, 2015, Aetna responded as follows:

"Regarding Mr. Davidson's request for raw data, Dr. Barry agreed to release the IME test scores to Aetna; however, he declined to release the IME test protocols to Aetna or any third part.  Specifically, Dr. Barry wrote: 'I've been asked if I intend to send copies of Mr. V's test protocols.  In my experience this request has been limited to forensic evaluations where opposing attorneys want their own experts to review for errors and misinterpretations.  I am reluctant to have my admin asst spend the time scanning/copying.  I am also reluctant to violate the copyright laws of Neuropsychology.  It these scores are needed for clinical purposes then you and the end user will understand, and the scores provided, along with the report, should be sufficient.  If the protocols are being requested for forensic purposes then I will respectfully await a court order.'"

39.   On March 4, 2015, Dr. Light provided a review of the information he was able to obtain regarding Vaught.  He opined, in part:

"I am able to comment on some aspects of the assessment as documented in his 9-page report.  Dr. Barry noted that Mr. Vaught reported his headache pain was an 8 out of 10 with him having recently been evaluated in the ER with elevated blood pressure and severe head pain that was unremitting.  He complained of being uncomfortably hot to Dr. Barry in the office despite the air-conditioned room.  The appropriateness of continuing neuropsychological testing under such conditions is questionable at best.  Dr. Barry noted that his presentation was marked by 'subdued affect' and quiet speech with occasional deep sighs, along with appetite issues: all symptoms consistent with a significant depression.  Given these factors Mr. Vaught's poor performance on neuropsychological tests including PVTs, administered by Dr. Barry is not surprising."

"It should be noted contrary to Drs. Shallcross and Barry's claims, performance validation measures do not assess 'malingering,' defined as exaggeration or creation of deficits for secondary gain.  These measures merely assess level of performance on tasks that should be performed above a certain level even in one with cognitive impairment. . . .  There are many reasons other than 'malingering' why such measures may be failed. These include lack of rapport with the examiner, the belief that they are being abused, taken advantage of, or not taken seriously, extreme discomfort, poor ability to remain attentive to task due to physical pain, boredom with the testing procedure, lack of respect for the examiner, severe depression with associated lack of concern regarding test results, a cry for help, or cognitive sedation due to medications.  The lack of validity testing obtained by Dr. Barry is hardly surprising given Mr. Vaught's reported physical status on those dates, as well as the fact that he had performed the same or similar tests previously with Dr. Todd.  In addition, Mr. Vaught acknowledged taking Ambien and oxycodone with the medication dosage not stated.  At sufficient doses either of these medications could result in reduced performance that could result in PVT failure. . . ."

"Given these observations, in this reviewer's opinion, the results of the evaluation of Dr. Barry are in fact invalid and therefore he is unable to offer a credible opinion on Mr. Vaught's functional status.  In contrast, the results of Dr. Todd's examination appear to be credible with appropriate cautions therein regarding interpretation of the obtain results."

* * * *

"It is the opinion of this neuropsychologist that Mr. Vaught cannot be validly assessed absent significant relief of pain.  It is unrealistic to expect that repeated

assessment given his apparent medical and functional status would permit the production of valid neuropsychological test results.  Subjecting Mr. Vaught to the extended cognitive effort and concentration required for a comprehensive neuropsychological assessment (i.e., 8 or more hours of testing) given his chronic headaches, hypertension and signs of vascular brain deterioration does not appear to be prudent or warranted."

40.    In a March 16, 2015, report, Dr. Roger Light responded to Drs. Barry and Shallcross' opinions regarding Dr. Todd's application of validity testing:

"These statements are not true as Dr. Todd did in fact administer and report the results of the '21-item-Test'. . . . This is a validated free-standing Performance Validation Test ("PVT").  It is unclear why Drs. Barry and Shallcross are unfamiliar with this relatively common measure.  If they had requested the raw data and/or carefully reviewed Dr. Todd's report (with the results of the PVT used described on page 10 of Dr. Todd's report), the inclusion of this PVT measure should have been obvious."

Dr. Light explained that Dr. Todd noted the 21-Item-Test results "were within normal limits consistent with adequate effort, he acknowledged having concerns regarding Vaught's distractibility and tendency toward preoccupation."

## THE SECOND TERMINATOIN

41.    By letter dated August 7, 2015, Aetna terminated Vaught's LTD benefits for the second time ("The Second Termination"), essentially asserting

Vaught could perform his own occupation.

42.    By letter dated December 10, 2015, Vaught's counsel appealed The Second Termination of Vaught's LTD benefits.  As part of Vaught's appeal, Vaught submitted:

> A.    Vaught's sworn and signed Declaration in which he explained his conditions, medications, work history, daily activities, and why he could not perform his own occupation or any other occupation.
>
> B.    A 44-page appeal letter by counsel that: (1) incorporated Vaught's appeal from The Initial Termination of LTD benefits; (2) explained that Aetna was judicially estopped from claiming Vaught could perform his own occupation by virtue of The Initial Suit; (3) that Aetna's TSA confirmed Vaught's ongoing disability; (4) that Aetna relied upon fraudulent neuropsychological testing by Dr. Barry in its Second Termination of Vaught's benefits; (5) that Aetna's use of Dr. Barry's report was a breach of its fiduciary duty; (6) that Aetna's medical opinions were entitled to no weight; and (7) that Aetna's surveillance supported Vaught's ongoing disability.

43.     As part of its appeal review, Aetna retained Dr. Nick DeFilipps, Ph.D. to review Vaught's records.

A.     Aetna instructed Dr. DeFilipps, in part:

"2.  Please contact Dr. Phillip Barry and request the raw data from the 07/24/2014 IME.  Please review this information in conjunction with the medical records submitted and render a conclusion about the claimant's level of cognitive functioning from 07/24/2014 - the present time."

B.     Dr. DeFillipis responded, in part:

"On 02/05/2016 at 1200 EST I attempted to contact Dr. Phillip Barry.  I left a detailed voicemail message noting the reason for my call and requesting a return call.  My contact number was provided and the best time to reach me was noted.  A time frame for call back was provided. On 02/05/2016 at 1300 I was able to speak with Dr. Phillip Barry.  I requested to have the raw data sent to me and he asked for an ROI.

On 02/05/2016 at 1600 a ROI was sent to Dr. Phillip Barry's office.

On 02/09/2016 at 1500 I attempted to contact Dr. Phillip

Barry.  I left a detailed voicemail noting the reason for

my call and requesting a return call.  My contact number

was provided and the best time to reach me was noted.

A time frame was provided.  I also noted a faxed release

had been sent and I had not received the raw data

requested.

Questions I would have asked Dr. Phillip Barry include:

Did you administer all the tests or use a psychometrist?

Do you believe the claimant was functionally impaired

when you saw him?

Do you know if the claimant is in treatment?"

C.      Aetna also asked Dr. DeFillipis, in part:

"3.  Does the raw data supplied support the conclusions
rendered by the IME physician?  If there are any areas
where the raw data does not support the conclusion or if
there are any discrepancies please detail those."

D.      To which Dr. DeFillipis responded: "I did not receive raw test

         data."

E.      Dr. Barry's refusal to provide the raw data of his testing to Dr.

         DeFillipis, despite their authorization to receive the raw data,

demonstrates that Dr. Barry's conclusions are fraudulent and not only not supported by the raw data but contrary to the raw data.

44.    By letter dated March 7, 2016, Aetna denied Vaught's appeal from the Second Termination of Vaught's LTD benefits.  In its denial of appeal of The Second Termination, Aetna (1) relied upon Dr. Barry's report despite its knowledge that that report is fraudulent and unsupported by the raw data of Dr. Barry's testing; (2) failed to address Vaught's appeal by ignoring: Vaught's re-certification of SSDI benefits in July 2015 only noting, "Since [Vaught's] SSD award was several years prior to our decision. . . ."; (3) failed to address Vaught's appeal argument that Aetna was judically estopped from asserting Vaught could perform his own occupation by virtue of the resolution of The Initial Suit; (4) failed to address Vaught's appeal argument that Aetna's TSA confirmed his continued disability; (5) failed to address Vaught's appeal argument that Dr. Barry's neuropscyhological report was fraudulent, given his refusal to provide the appropriate mental health professionals with the raw testing data; and (6) failed to address Vaught's appeal argument that Aetna's surveillance proved ongoing disability.

45.    Plaintiff has exhausted all administrative remedies required to be exhausted by the terms of the Plan and by ERISA.

46.     At all times mentioned herein Plaintiff was, and continues to be, totally disabled under the Policy's definition of totally disabled, and therefore entitled to benefits under the terms of the Policy.

47.     Aetna is required to provide claimants full and fair reviews of their claims for benefits pursuant to 29 U.S.C. § 1133 and its implementing Regulations. Specifically:

    A.    The Secretary of Labor has adopted Regulations to implement the requirements of 29 U.S.C. § 1133. These Regulations are set forth in 29 C.F.R. § 2560.503-1 and provide, as relevant here, that employee benefit plans, including Aetna herein, shall establish and maintain reasonable procedures governing the filing of benefit claims, notifications of benefit determinations, and appeal of adverse benefit determinations and that such procedures shall be deemed reasonable only if:

        i.    Such procedures comply with the specifications of the Regulations.

        ii.    The claims procedures contain administrative processes and safeguards designed to ensure and to verify that benefit determinations are made in accordance with governing plan documents and that, where appropriate,

25

the Plan provisions have been applied consistently with respect to similarly situated claimants.

iii.  Written notice is given regarding an adverse determination (i.e., denial or termination of benefits) which includes: the specific reason or reasons for the adverse determination; with reference to the specific plan provisions on which the determination is based; a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; a description of the Plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under Section 502(a) of ERISA following a denial on review; if an internal rule, guideline, protocol, or similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and

that a copy of such rule, guideline, protocol, or other

criterion will be provided free of charge to the claimant

upon request.

iv.   Aetna  is required to provide a full and fair review of any

adverse determination which includes:

a.   That a claimant shall be provided, upon request

and free of charge, reasonable access to, and

copies of, all documents, records, and other

information relevant to the claimant's claim for

benefits.

b.   A document, record, or other information shall be

considered "relevant" to a claimant's claim if such

document, record, or other information: (1) was

relied upon in making the benefit determination;

(2) was submitted, considered, or generated in the

course of making the benefit determination,

without regard to whether such document, record,

or other information was relied upon in making the

benefit determination; (3) demonstrates

compliance with the administrative processes and

safeguards required pursuant to the Regulations in making the benefit determination; or (4) constitutes a statement of policy or guidance with respect to the Plan concerning the denied benefit, without regard to whether such statement was relied upon in making the benefit determination.

c. The Regulations further provide for a review that takes into account all comments, documents, records and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

d. The Regulations further provide that, in deciding an appeal of any adverse determination that is based in whole or in part on a medical judgment that the appropriate named fiduciary shall consult with a healthcare professional who has appropriate training and experience in the field of medicine involved in the medical judgment.

e. The Regulations further require a review that does

28

not afford deference to the initial adverse benefit

determination and that is conducted by an

appropriate named fiduciary of the Plan who is

neither the individual who made the adverse

benefit determination that is the subject of the

appeal nor the subordinate of such individual.

f.    The Regulations further provide that a healthcare

professional engaged for the purposes of a

consultation for an appeal of an adverse

determination shall be an individual who is neither

the individual who was consulted in connection

with the adverse benefit determination which was

the subject of the appeal nor the subordinate of

any such individual.

g.    The Regulations further provide that, as to

disability claims, the plan administrator "shall

notify a claimant" of the plan's determination on

review within a reasonable time not later than 45

days after receipt of the claimant's request for

review by the plan unless special circumstances

require an extension of time for processing the

claim, in which case written notice of the

extension shall be furnished to the claimant prior

to the termination of the initial 45 day period and

in no event shall such extension exceed a period of

45 days from the end of the initial period.

48.   Aetna denied Plaintiff a full and fair review of his claim for LTD

benefits:

A.   Aetna does not have, or, with respect to Vaught's claim and

appeal, did not follow, administrative processes and safeguards

designed to ensure and to verify that benefit determinations are

made in accordance with governing plan documents and that,

where appropriate, the Plan provisions have been applied

consistently with respect to similarly situated claimants.

B.   Aetna does not have, or, with respect to Vaught's appeal, did

not follow, the Regulations–which require that a review take

into account all comments, documents, records and other

information submitted by the claimant relating to the claim,

without regard to whether such information was submitted or

considered in the initial benefit determination.

C.      Vaught, through counsel, requested that Aetna  provide him with copies of all documents, records, or other information relevant to his claim, as that term is defined by ERISA Regulations.  Aetna  failed and refused to provide him with all such documents, records and other information, in violation of ERISA Regulations.

D.      Aetna  failed and refused to provide all relevant documents to Plaintiff for use in his appeal.

E.      Defendant Aetna  otherwise violated the Regulations.

49.    Defendant's denial of Plaintiff's long-term disability benefits was arbitrary and capricious, an abuse of discretion, and a violation of the terms of the Policy.

50.    Review of this claim is *de novo* because the Insurance Commissioner of Hawaii has declared that "[a] 'discretionary clause' granting to a plan administrator discretionary authority so as to deprive the insured of a *de novo* appeal is an unfair or deceptive act or practice in the business of insurance and may not be used in health insurance contracts or plans in Hawaii."  Insurance Division, Department of Commerce & Consumer Affairs, State of Hawaii, *Memorandum 2004-13H re: Discretionary Clauses in HMSA's Agreement for Group Health Plan and Guide to Benefits*, at 3 (Dec. 8, 2004), attached hereto as

Exhibit 1, at 3.  The Commissioner made clear that his declaration encompassed

ERISA plans.  See *Id.* at 4 ("This decision is not affected by whether a plan is an

ERISA plan.")  Thus, any reservation of discretionary authority in The Policy is

void.

51.     If, for any reason, this Court determines that review is not *de novo*,

then this Court is required to review the termination of Plaintiff's LTD benefits

with minimal deference to Aetna's determination because:

A.     Aetna is both the administrator and the funding source of

benefits for the Plan, and therefore has a conflict of interest;

B.     Aetna utilized medical experts who had a financial conflict of

interest to review Plaintiff's claim and appeal, and therefore did

not provide a neutral, independent review process;

C.     Aetna failed to comply with ERISA's procedural requirements

regarding benefit claims procedures and full and fair review of

benefit claim denials.

D.     Aetna's decision-making process was affected by its economic

self-interest.

52.     An actual controversy has arisen and now exists between Plaintiff, on

the one hand, and Aetna, on the other hand with respect to whether Plaintiff is

entitled to long-term disability benefits under the terms of The Policy.

53.     Plaintiff contends, and Aetna disputes, that Plaintiff is entitled to LTD benefits under the terms of The Policy because Plaintiff contends at all relevant times that he was and is disabled under the terms of The Policy.

54.     Plaintiff desires a judicial determination of his rights and a declaration as to which party's contention is correct, together with a declaration that Aetna is obligated to pay long-term disability benefits, under the terms of The Policy, retroactive to the first day his benefits were not paid, until and unless such time that Plaintiff is no longer eligible for such benefits under the terms of The Policy.

55.     A judicial determination of these issues is necessary and appropriate at this time under the circumstances described herein in order that the parties may ascertain their respective rights and duties, avoid a multiplicity of actions between the parties and their privities, and promote judicial efficiency.

56.     As a proximate result of Aetna's wrongful conduct as alleged herein, Plaintiff was required to obtain the services of counsel to obtain the benefits to which he is entitled under the terms of The Policy.  Pursuant to 29 U.S.C. § 1132(g)(1), Plaintiff requests an award of attorney's fees and expenses as compensation for costs and legal fees incurred to pursue Plaintiff's rights.


WHEREFORE, Plaintiff prays judgment as follows:

1.      For declaratory judgment against Aetna, requiring Aetna to pay long-term disability benefits under the terms of the Policy to Plaintiff for the period to which he is entitled to such benefits, with prejudgment interest on all unpaid benefits, until Plaintiff attains the age of 65 years or until it is determined that Plaintiff is no longer eligible for benefits under the terms of the Policy.

2.      For attorney's fees pursuant to statute against defendant.

3.      For costs of suit incurred.

4.      For such other and further relief as the Court deems just and proper.

Dated: Honolulu, Hawai'i, April 27, 2016.

*/s/ Carl M. Varady*
CARL M. VARADY,

Attorney for Plaintiff,
DALE VAUGHT